**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE APPLICATION OF PJSC NATIONAL BANK TRUST<br><br>REQUEST FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | Civ. No. |

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR DISCOVERY**

HOGAN LOVELLS US LLP

390 Madison Avenue
New York, NY  10017
Telephone:  (212) 918-3000
dennis.tracey@hoganlovells.com
david.michaeli@hoganlovells.com

*Attorneys for Applicant PJSC National Bank Trust*

# **TABLE OF CONTENTS**

**Page(s)**

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR DISCOVERY** .......... i

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF RELEVANT FACTS .....................................................................................2

    A.    The Parties .........................................................................................................2

    B.    The Ananyev Brothers' Fraud ............................................................................4

    C.    KPMG's Findings ...............................................................................................6

    D.    The Brothers' Regulatory Fraud .........................................................................7

    E.    NBT's Three Cyprus Actions ............................................................................8

    F.    The Relevance of the NY Banks.........................................................................9

ARGUMENT ...............................................................................................................................11

    A.    NBT Satisfies All Three Statutory Factors .....................................................11

        i.    The NY Banks Are All Found Within This District ......................................12

        ii.    The Discovery Sought is "For Use" in a Foreign Proceeding .........................12

        iii.    The Discovery is Sought by an "Interested Party" ..........................................13

    B.    All Four *Intel* Discretionary Factors Support Discovery ...............................13

        i.    Respondents Are Not Parties in the Foreign Litigation ..................................14

        ii.    The Cypriot Courts Are Receptive to Federal Court Assistance Via Section 1782..................................................................................................14

        iii.    This Application Does Not Circumvent Foreign Proof-Gathering Restrictions ......................................................................................................15

        iv.    The Request is Not Unduly Intrusive or Burdensome ....................................16

CONCLUSION ............................................................................................................................16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Micro Devices, Inc. v. Intel Corp.*,
   292 F.3d 664 (9th Cir. 2002), aff'd, 542 U.S. 241 (2004) ...................................................... 11

*Al Fayed v. United States*,
   210 F.3d 421 (4th Cir. 2000) ................................................................................................. 13

*In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Ord. Pursuant to
   28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*,
   No. 13 MISC. 397 PGG, 2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014), *aff'd
   sub nom. Gorsoan Ltd. v. Bullock*, 652 F. App'x 7 (2d Cir. 2016) .......................................... 15

*In re Application of Lake Holding & Fin. S.A.*,
   No. 20-MC-652 (RA) (KNF), 2021 WL 2581427 (S.D.N.Y. June 23, 2021) ........................ 14

*In re Application of Malev Hungarian Airlines*,
   964 F.2d 97 (2d Cir.1992) ................................................................................................ 11, 13

*ex parte Application of Ontario Principals' Council*,
   No. 513MC80237LHKPSG, 2013 WL 6073517 (N.D. Cal. Nov. 8, 2013) ........................... 12

*In re Application of PV Group*,
   No. 1:18-mc-00376-JPO (S.D.N.Y. Aug. 21, 2018) ............................................. 2, 10, 12, 15

*In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Ord. Pursuant to
   28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*, No.
   13 MISC. 397 PGG, 2014 WL 7232262, at *8 (S.D.N.Y. Dec. 10, 2014), *aff'd
   sub nom. Gorsoan Ltd. v. Bullock*,
   652 F. App'x 7 (2d Cir. 2016) ................................................................................................ 15

*Gushlak* v. *Gushlak*,
   486 Fed. Appx. 215 (2d Cir. 2012) ........................................................................................ 11

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) .................................................................................................... 11, 13, 14

*ex parte Lee-Shim*,
   No. 513MC80199LHKPSG, 2013 WL 5568713 (N.D. Cal. Oct. 9, 2013) ............................ 15

*Matter of Lufthansa Technick AG*,
   No. C17-1453-JCC, 2019 WL 280000 (W.D. Wash. Jan. 22, 2019) ................................ 12, 14

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015)..................................................................................................12

*In re Naranjo*,
  768 F.3d 332 (4th Cir. 2014) ................................................................................................13

*In re P.T.C. Prod. & Trading Co.*,
  AG, No. 1:20-MC-00032-MR-WCM, 2020 WL 7318100 (W.D.N.C. Dec. 11,
  2020) ....................................................................................................................................13

*In re Petition of Newbrook Shipping Corp.*,
  Civ. No. JKB-20-150, 2020 WL 6451939 (D. Md. Nov. 3, 2020)...................................14, 15

*In re Polymer Solutions Int'l, Inc.*,
  Civ. No. DKC-18-1864, 2019 WL 1239778 (D. Md. March 18, 2019)..................................14

*Schmitz v. Bernstein Liebhard & Lifshitz LLP*,
  376 F.3d 79 (2d Cir. 2004)....................................................................................................12

*Servotronics, Inc. v. Boeing Co.*,
  954 F.3d 209 (4th Cir. 2020) ................................................................................................11

**Statutes**

28 U.S.C. § 1782............................................................................................................... *passim*

PJSC National Bank Trust ("NBT") submits this memorandum of law in support of its application for discovery pursuant to 28 U.S.C. § 1782 from J.P. Morgan Chase, N.A. ("JP Morgan"), Bank of New York Mellon ("BNY") and Citibank N.A. ("Citi") in support of foreign proceedings pending in Cyprus.

## PRELIMINARY STATEMENT

NBT brings this action seeking transactional records from three banks located in this District that are relevant to claims NBT is litigating in Cyprus. The underlying dispute involves a multi-billion dollar banking fraud perpetrated by two brothers, Dmitri and Alexei Ananyev. At least between August 2015 and December 2017, the Ananyev brothers controlled two Russian banks with assets of several billion dollars. The Ananyev brothers embezzled a substantial portion of these assets, leading to massive losses, including losses for NBT.

The Ananyev brothers established the first of the two banks at issue, PJSC Promsvyazbank ("PSB"), in May 1995. In August 2015, PSB acquired a majority interest in another bank, JSC Avtovazbank ("AVB") and, after assuming control over AVB's operations, began siphoning off AVB's assets. This continued until at least December 2017, when the Central Bank of Russia assumed control over PSB due to its failure to maintain required reserve levels. Subsequent investigations revealed that the brothers had been self-dealing and embezzling depositors' assets for years. Many of these depositors were ordinary Russian citizens, pensioners whose savings were effectively stolen by the Ananyev brothers.

NBT, which is AVB's successor in interest, brought a series of claims against the brothers and their affiliates in Cyprus beginning in 2020. Among other things, those claims assert that the Ananyev brothers caused AVB to transfer millions of dollars in purported loans to shell corporations tied to the brothers, who then used their control over these corporations to dissipate the transferred funds rather than repaying them. The brothers also caused PSB to make similar

1

bad loans, which were then assigned to AVB – often in return for full payment from AVB – despite the loans having little or no chance of being repaid.

The Ananyev brothers are believed to have used a network of correspondent banks to carry out their fraudulent acts, including to make initial transfers of funds to putative bank customers in the form of loans, and to make subsequent transfers of funds from these entities to other entities or individuals associated with the brothers. In particular, PSB is known to have utilized BNY, Citi and JP Morgan (collectively, the "NY Banks") as correspondent banks to make the fraudulent transfers. NBT accordingly seeks records from these banks to help it establish where funds were sent, at what times, and in what amounts.

The discovery NBT seeks will impose no significant burden on the NY Banks, and is similar to discovery authorized by a court in this district in favor of another PSB creditor pursuant to Section 1782 in 2018.[1] As was the case with that applicant, NBT satisfies all of the statutory and discretionary factors for obtaining discovery under Section 1782, and respectfully requests that its application be granted.

## STATEMENT OF RELEVANT FACTS[2]

### A.     The Parties

Applicant NBT is a financial institution headquartered in Russia and owned by the Central Bank of Russia ("CBR") (an independent body with the exclusive right to issue currency and the bank regulating body supervising banking and financial activity in Russia). NBT has been

---

[1] See *In re Application of PV Group*, No. 1:18-mc-00376-JPO (S.D.N.Y. Aug. 21, 2018) (granting similar discovery from the NY Banks).

[2] The facts upon which the Application is based are set forth more fully in the December 23, 2021 Declaration of Andrey Mikhailovich Tseshinskiy ("Tseshinskiy Decl."), the December 23, 2021 Declaration of Andreas Michaelides ("Michaelides Decl."), the December 29, 2021 Declaration of Annabella Antoniades ("Antoniades Decl."), and the exhibits thereto.

2

operating under a financial rehabilitation scheme supervised by the CBR since December 2014, and has been administered by the CBR since 2018.  Tseshinskiy Decl. ¶ 2.

Respondents, the NY Banks, all reside and are found in the Southern District of New York.  JP Morgan is headquartered at 270 Park Avenue, New York, NY 10017.  BNY is headquartered at 240 Greenwich Street, New York, NY 10286.  And Citi is headquartered at 388 Greenwich Street, New York, NY 10013.

At issue in this action are financial records relating to transfers to or from PSB, AVB, or their affiliates.  PSB was formed by the Ananyev brothers in May 1995.  Within ten years, PSB grew to become one of Russia's twenty largest banks, with more than two dozen regional branches, including one in Cyprus ("PSB Cyprus").  In 2014, PSB became one of the first three banks recognized as a "systemically important bank" by the CBR.  The Ananyev brothers maintained indirect majority ownership and control of PSB from at least 2005 until December 2017, when the CBR placed PSB under financial rehabilitation and appointed temporary administrators.  Tseshinskiy Decl. ¶ 3.

AVB was a state-owned bank established in November 1988.  After the collapse of the Soviet Union, AVB became a private bank.  In 2015, the CBR placed AVB under financial rehabilitation, and designated PSB as the bank responsible for that financial rehabilitation (a so called "bridge bank").  As a result, PSB became the sole shareholder of AVB and, accordingly, the Ananyev brothers ended up in control of both banks. The CBR intended for AVB to eventually be merged into PSB, however once the CBR discovered PSB's financial problems and appointed a temporary administration in it, CBR terminated PSB's responsibility for rehabilitating AVB.  Instead, CBR elected to merge AVB into NBT, at which point NBT became AVB's legal successor in relation to it rights and obligations under all and any agreements.  Tseshinskiy Decl. ¶ 4.

B.    **The Ananyev Brothers' Fraud**

Between December 27, 2016 and May 16, 2017, the CBR conducted an inspection of PSB's finances. Over the course of the inspection, the CBR determined that PSB held insufficient reserves and needed to increase its reserves by approximately €1.3 billion. That December, the CBR revised the amount of additional capital PSB needed to raise to €1.5 billion after determining that PSB had underestimated certain financial risks. Tseshinskiy Decl. ¶ 5.

Following completion of the CBR's inspection, PSB responded to the CBR's regulatory findings by providing financial reports to the CBR. The CBR determined that PSB's internal reports did not reflect the actual financial position of PSB and were substantially unreliable, and ordered PSB to raise its reserve level by the outstanding amount required for PSB's operations. PSB's funds were insufficient to replenish reserves by the outstanding amount indicated by the CBR without the risk of decreasing PSB's own capital below the statutory minimum. Nevertheless, PSB decided to top-up the reserves on the outstanding amount using its own capital. As a result, PSB's own capital decreased below the statutory minimum, which led the CBR placed PSB under temporary administration, seizing control of the bank. Tseshinskiy Decl. ¶ 6.

On the eve of PSB's nationalization, the Ananyev brothers and affiliated individuals appear to have taken extensive steps to loot remaining assets and destroy evidence. For instance, between May 29, 2017 and December 14, 2017, the Cypriot company Arovana Trading Limited ("Arovana") entered into five loan agreements with PSB which had fixed lending limits of up to RUR 3.08 billion and USD 34.4 million (cumulatively, approximately €67.2 million) (the "Arovana Loan Agreements"). On September 20, 2018, as a result of Arovana's defaults and pursuant to the terms of the Arovana Loan Agreements, AVB accelerated the loans and demanded payment of the outstanding debt. Arovana's debt, which was assigned from PSB to AVB, remains

outstanding and is inadequately secured, and NBT believes Arovana is in the process of winding up.  Tseshinskiy Decl. ¶¶ 7-8.

Arovana appears to have transferred part of the loan proceeds received from PSB to other companies from the same group of companies (Russian Timber Group of Companies) which were themselves PSB's borrowers. In particular, Arovana transferred RUR 2.67 billion (approx. €39.01 million) out of the funds it had received from PSB to SEL-Trade LLC and TSFK LLC, the Russian companies, which themselves were PSB's borrowers and were part of the Russian Timber Group of Companies connected to Ananyev brothers. The funds were transferred allegedly as advance payments for timber to be delivered to Arovana, but the timber was not, to my knowledge, ever delivered. The funds appear to have instead been transmitted to other companies in the RTG Group while the suppliers themselves are now in bankruptcy.  Tseshinskiy Decl. ¶ 9.

On January 30, 2014, PSB entered into a loan agreement with the Cypriot company Dimoresa Commercial Ltd ("Dimoresa") with a fixed disbursement limit of $25 million (the "Dimoresa Loan Agreement"). On June 23, 2014, the disbursement limit under the Dimoresa Loan Agreement was raised to $30 million. A guarantee provided by one of the wealthiest guarantors in the transaction was terminated on the eve of PSB's collapse.  Tseshinskiy Decl. ¶ 10.

According to media accounts, the temporary administration appointed to run PSB discovered that credit dossiers for more than RUR 100 billion in loans were "lost." Russian investigators, who were subsequently able to locate those records, determined that they had been removed from PSB at night on December 15, 2017 by someone driving a car with no license plate. Tseshinskiy Decl. ¶ 11.

Once regulators had access to PSB's records, a fuller and more troubling picture of the bank's problems quickly emerged. Russian regulators determined that PSB actually required

5

approximately $4 billion in additional capital – nearly three times their original estimate – and took steps to bail out PSB through funding provided by the CBR. At that time, AVB was also in financial distress – the very reason the CBR, believing at the time that PSB was financially sound, had originally arranged for PSB to acquire and manage AVB. After discovering PSB's true condition, the CBR changed plans and ultimately arranged for AVB to be merged with NBT. NBT hired KPMG to investigate in detail the events that led to the collapse of PSB and AVB. After doing so, KPMG reported that the Ananyev brothers had perpetrated a massive and complex fraud involving both PSB and AVB.  Tseshinskiy Decl. ¶ 12.

NBT's forensic investigation into the Ananyev brothers' fraudulent activities is ongoing but has already revealed at least 26 transactions with 11 borrowers that harmed PSB and/or AVB. The Ananyev brothers appear to have used dozens of offshore companies and nominee shareholders to siphon off assets.  Tseshinskiy Decl. ¶ 13.

       **C.**      **KPMG's Findings**

Details of the in-depth analysis performed by KPMG are set out in KPMG's reports. Among other things, KPMG determined that: (1) PSB and AVB issued loans on favorable terms and with inadequate security by way of collateral to borrowers with unsatisfactory financial positions; (2) the loan funds were directed to foreign companies (in some cases distributed among the same group as the borrower) with signs of affiliation with the Ananyev brothers and/or in some cases whose beneficiaries were not disclosed in open sources, according to the relevant jurisdictional requirements (which might be an indicator of the fraudulent transfer of funds to concealed beneficiaries), and in certain cases were used for commercially dubious transactions; and (3) the loans were not repaid on time by the borrowers, many of which became insolvent, and in most cases with little or no assets and security that was not valuable and/or not enforceable. KPMG concluded that these loans were not made in the best interests of PSB and AVB and show

6

"*signs of fraudulent activities potentially aimed at siphoning assets and funds away from PSB and AVB.*" Tseshinskiy Decl. ¶ 15, Exs. A-C.

        D.        **The Brothers' Regulatory Fraud**

In addition to making fraudulent loans in order to siphon off depositor funds to their own accounts, the Ananyev brothers also appear to have gone to great lengths to conceal information from Russian banking regulators and creditors. As part of these efforts, PSB maintained two sets of books – "official" documentation that would be presented to the banking regulators for financial and other reporting, and confidential internal documentation, which had the code name at PSB of "CNF Documentation" (CNF stands for "confidential") and which was hidden from regulators and was to be used only by PSB's and AVB's staff. Tseshinskiy Decl. ¶ 16.

There were also a number of companies (known as "special purpose companies" or "SPCs") which were not formally owned by PSB but were in fact controlled by it. Due to the lack of a formal connection between the SPCs and PSB, these companies appear to have been mainly used to artificially decrease the amount of provisions PSB had to maintain if it participated in a transaction directly. There were two typical ways in which PSB used these SPCs. First, when PSB had to increase the amount of provision it previously created due to, for example, a borrower's default. In order to avoid creating new provision, PSB would extend a loan to an SPC with the loan amount, in turn, being used to repay the loan of a defaulted borrower. In order to create the fiction that the SPC was a real borrower, employees of AVB and PSB would even draw up a business plan of how the SPC would use the loaned funds. Given that the using of the loan in such circumstances was seemingly for the financial manipulation of capital provisions, it appears that these business plans served no legitimate purpose. The second way that SPCs appear to have been used in situations where PSB wanted to gain control over the assets of a defaulted borrower through enforcement, but it was not possible to put the asset on the balance sheet of PSB due to certain

difficulties related to banking compliance. PSB would engage an SPC so that it would become the formal owner an asset instead of PSB (e.g. by way of an assignment of the debtor's debt to an SPC, which subsequently took steps to enforce against the debtor's assets on its own behalf, while remaining informally controlled by PSB). As a result, PSB would have de facto control over the asset but avoid the negative consequences connected with direct ownership of the asset. Tseshinskiy Decl. ¶ 17.

The Ananyev brothers' efforts at concealment were highly successful, and allowed them to get away with fraud for years. When creditors and regulators finally closed in, the Ananyev brothers fled the country, absconding with what is estimated to be billions of dollars in misappropriated funds. Tseshinskiy Decl. ¶ 18.

### E. NBT's Three Cyprus Actions

NBT seeks discovery in this action in support of three claims it has filed in the District Court of Limassol, Cyprus. NBT filed its first claim on November 12, 2020 (Action No. 2598/2020) against the Ananyev brothers and their wives, Lyudmila Ananyeva and Daria Ananyeva (collectively, the "Foreign Defendants"). The claim seeks to recover damages approximately €270 million for conduct relating to the Ananyev brothers' fraud. In connection with this claim, NBT on *ex parte* basis sought an interim worldwide freezing order against the Foreign Defendants' assets and over assets which are believed to be nominally held on their behalf. The Cypriot court granted this request on November 17, 2020. On November 19, 2021 the judge of the District Court of Limassol, Cyprus set aside the worldwide freezing order, finding that NBT had not disclosed certain material facts. Tseshinskiy Decl. ¶ 19; Michaelides Decl. ¶¶ 6-7, Ex. B, C.

On December 11, 2020, NBT filed a second claim in the District Court of Limassol, Cyprus against the Foreign Defendants (Action No. 2944/2020), seeking to recover additional damages of

between €296 million and €339 million for additional fraudulent transfers and activities uncovered by KPMG's ongoing analysis. On October 20, 2021 NBT on *inter partes* basis sought an interim worldwide freezing order against the Foreign Defendants' assets and over assets which are believed to be nominally held on their behalf. The application is currently pending in Cyprus. Tseshinskiy Decl. ¶ 20; Michaelides Decl. ¶¶ 8, Ex. D.

On December 11, 2020, NBT filed a third claim in the District Court of Limassol, Cyprus against the Foreign Defendants, seeking to recover additional damages of between €15 million and €17 million for additional fraudulent transfers and activities. All three actions are currently pending in Cyprus. Tseshinskiy Decl. ¶ 21; Michaelides Decl. ¶¶ 8, Ex. E.

### F. The Relevance of the NY Banks

Although the Ananyev brothers' fraud was complex, at its heart it involved transferring money from PSB, AVB, or affiliates to entities or individuals indirectly or directly affiliated with the brothers, who then passed the funds on to other affiliates of the brothers without ever repaying the funds to the banks that provided the original loans. Several of these transactions are believed to have been conducted in US dollars through the NY Banks. PSB is believed to have used the NY Banks, each of which was previously listed on PSB's website as a PSB correspondent bank, to process US dollar transactions. Tseshinskiy Decl. ¶ 22.

Briefly put, NBT believes that the NY Banks processed transactions that may be connected to or form part of one or more fraudulent schemes orchestrated by the Ananyev brothers. The details of seven such schemes are set forth in the Tseshinskiy Declaration and attached KPMG reports, which describe the manner in which the Ananyev brothers used bad loans and other transactions to siphon off assets. NBT seeks discovery relating to any such transactions, including but not limited to transactions involving PSB, AVB, and any of the following individuals or entities affiliated with the Ananyev brothers: Antracite Investment Limited; Urgula Platinum Limited,

9

Menrela Limited; Promsvyaz Capital B.V.; Peters International (Cayman) Limited; Peters International Investment Limited N.V.; Postscriptum Capital Limited; Fintailor Investments Limited; companies involved in Delvenisto Scheme (Delvenisto Investments Limited, Marendo Investments Limited, Krasnobrodsky Yuzhny LLC, Anevlessa Investments Ltd, Wolater Investments Limited, Queeld Ventures Limited, Croston Consultant Limited, Kipford Ventures Ltd, Cydrine Investment Ltd, Garrison Corporate Ltd); companies involved in Klirinaso Scheme (Klirinasto Investments Limited, Menilo Trading Limited, Razrez Nagorny LLC, Unique Marketing and Investments Ltd, Zafirex Trading Limited); companies involved in Fivolsenso Scheme (Fivolsenso Services Ltd, Fikotelisa Investments Ltd, in Sibirskie Resursy LLC); companies involved in Finans Invest Scheme (Finans Invest LLC, Jakardis Holdings Limited, Zorilla Investments Limited, Evryhos Management Limited, Tokarevo LLC, Moselectrotechnology LLC, Standard System Building LLC, AS-Stroykontakt LLC, PSC Stroyfaza LLC, Elmdale Investments Limited, Brightstar Overseas Inc), companies involved in Dimoresa Scheme (Dimoresa Commercial Ltd, Agro Centre LLC, Stroyzemproekt LLC, Solntsevo JSC, Torino LLC, PSN Group, Zafirex Trading Limited); companies involved in Atecia Scheme (Atecia Holdings Limited, Promsvyaz Real Estate Private Equity Fund L.P.); companies involved in Arovana Scheme (Arovana Trading Limited, RTG Group); Dmitri Ananyev; Alexei Ananyev; Elena Nikolaevna Tsareva; Gennady Anatolievich Kochkalda; Andrey Vladislavovich Tokarev; Zhanneta Levienvna Isakova; Oleg Olegovich Sultanbekov; Mikhail Vicheslavovich Malykhin; Elena Borisovna Titova; Elena Mikhailovna Kazakova; or Alexandr Ivanovich Romannikov.  Tseshinskiy Decl. ¶¶ 23-81, Exs. A-C; Michaelides Decl. Exs. B, D-E.

Similar discovery was already authorized in August 2018 in *In re Application of PV Group*, No. 1:18-mc-00376-JPO (S.D.N.Y. Aug. 21, 2018).

**ARGUMENT**

Section 1782 provides that "[t]he district court of the district in which a person resides or is found may order him to give testimony or statement or to produce a document or other thing for use in a proceedings in a foreign or international tribunal." The purpose of Section 1782 is "to provide federal-court assistance in the gathering of evidence for use in a foreign tribunal." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). Section 1782 reflects "the twin aims of … providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *Advanced Micro Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 669 (9th Cir. 2002), aff'd, 542 U.S. 241 (2004) (citing *In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir.1992)). The statute "reflects a long-term — over 150-year — policy of Congress to facilitate cooperation with foreign countries by 'provid[ing] federal-court assistance in gathering evidence for use in foreign tribunals.'" *Servotronics, Inc. v. Boeing Co.*, 954 F.3d 209, 212–13 (4th Cir. 2020) (quoting *Intel*, 542 U.S. at 247).[3]

NBT satisfies all statutory and discretionary factors. Accordingly, discovery should be authorized.

  **A.**  **NBT Satisfies All Three Statutory Factors**

Under well-settled law, discovery pursuant to § 1782 is appropriate and should be authorized where three statutory factors are met and where a series of four discretionary factors set forth in *Intel* also support discovery. The statutory factors are: (1) the person from whom

---

[3] NBT submits this Application *ex parte* as that is the standard manner in which § 1782 applications are commenced. *See e.g. Gushlak* v. *Gushlak*, 486 Fed. Appx. 215, 217 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 ex parte.")

11

discovery is sought resides or is found in the district where the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or an 'interested person.'" *Schmitz v. Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79, 85 (2d Cir. 2004). All three factors are met here.

### i. **The NY Banks Are All Found Within This District**

Each of the NY Banks from which discovery is sought is headquartered in Manhattan and therefore resides or is found in the Southern District of New York. JP Morgan is headquartered at 270 Park Avenue, New York, NY 10017; BNY is headquartered at 240 Greenwich Street, New York, NY 10286; and Citi is headquartered at 388 Greenwich Street, New York, NY 10013. As such, the respondents are all "found" within this District. *See also PV Group*, No. 1:18-mc-00376-JPO (S.D.N.Y. Aug. 21, 2018) (granting discovery pursuant to Section 1782 from these same three banks).

### ii. **The Discovery Sought is "For Use" in a Foreign Proceeding**

The requested discovery is also plainly for use in a foreign proceeding – namely, NBT's three Cypriot actions against the Foreign Defendants. Courts have taken an expansive view of the "for use" requirement of Section 1782, and have emphasized that "an applicant may seek discovery of any materials that can be made use of in the foreign proceeding to increase her chances of success." *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015). Where the discovery sought is for use in a foreign litigation, that is sufficient to satisfy this requirement. *See e.g.*, *In re ex parte Application of Ontario Principals' Council*, No. 513MC80237LHKPSG, 2013 WL 6073517, at *2–3 (N.D. Cal. Nov. 8, 2013) (granting subpoena request where "the discovery sought [was] for use in a Canadian defamation suit); *Matter of Lufthansa Technick AG*, No. C17-1453-JCC, 2019 WL 280000, at *1 (W.D. Wash. Jan. 22, 2019) (granting application where "the requested

discovery [was] for use in proceedings before foreign tribunals in Germany, the United Kingdom, and France").

### iii. The Discovery is Sought by an "Interested Party"

The Supreme Court has held that there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782". *Intel*, 542 U.S. at 256.  NBT is the claimant in its three actions pending against the Foreign Defendants in Cyprus.  Accordingly, NBT is an interested party for purposes of Section 1782.

## B. All Four *Intel* Discretionary Factors Support Discovery

"Section 1782 affords the district courts 'wide discretion' in responding to requests for assistance in proceedings before foreign tribunals." *In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014) (internal quotations and citations omitted).  In determining how to exercise this discretion, a court "should be guided by the statute's 'twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" *Al Fayed v. United States*, 210 F.3d 421, 424 (4th Cir. 2000) (citing *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)).

Courts examine four discretionary factors in their analysis of a Section 1782 application: "(1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the proposed discovery requests are "unduly intrusive or burdensome." *In re P.T.C. Prod. &*

13

*Trading Co.*, AG, No. 1:20-MC-00032-MR-WCM, 2020 WL 7318100, at *2 (W.D.N.C. Dec. 11, 2020) (citing *Intel*, 542 U.S. at 264–65).

> i. **Respondents Are Not Parties in the Foreign Litigation**

None of the NY Banks is, or ever has been, a party to NBT's Cypriot claims. Where the Respondent is not a party to the foreign proceeding, this factor weighs in favor of granting the application. *Intel*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."); *Matter of Lufthansa Technick AG*, No. C17-1453-JCC, 2019 WL 280000, at *2 (W.D. Wash. Jan. 22, 2019) ("Respondent is not a participant in the litigation in Germany or the United Kingdom, and therefore the first *Intel* factor weighs in Petitioner's favor as to those enforcement actions."); *In re Petition of Newbrook Shipping Corp.,* Civ. No. JKB-20-150, 2020 WL 6451939, at *6 (D. Md. Nov. 3, 2020) ("Here, neither GMS nor Sharma is a party to the South African Action, which weighs in favor of granting judicial assistance.").

> ii. **The Cypriot Courts Are Receptive to Federal Court Assistance Via Section 1782**

U.S. Courts "have applied the general approach that, in the absence of a foreign court's clear rejection of the assistance, the § 1782 application should be granted." *In re Newbrook Shipping Corp.*, No. MC JKB-20-0150, 2020 WL 6451939, at *6 (D. Md. Nov. 3, 2020) (citing *In re Polymer Solutions Int'l, Inc.*, Civ. No. DKC-18-1864, 2019 WL 1239778, at *6 (D. Md. March 18, 2019)).

Here, it is well settled that the Cyprus courts are receptive to § 1782 discovery obtained from the U.S. *See e.g.*, *In re Application of Lake Holding & Fin. S.A.*, No. 20-MC-652 (RA) (KNF), 2021 WL 2581427, at *18 (S.D.N.Y. June 23, 2021) (granting discovery in favor of

proceedings in Cyprus and other jurisdictions); *In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Ord. Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 13 MISC. 397 PGG, 2014 WL 7232262, at *8 (S.D.N.Y. Dec. 10, 2014), *aff'd sub nom. Gorsoan Ltd. v. Bullock*, 652 F. App'x 7 (2d Cir. 2016) ("there is no evidence that the Cyprus tribunal would be unreceptive to U.S. federal-court assistance"). *See also* Michaelides Decl. ¶¶ 14-19.

Since Cypriot courts are receptive to federal court assistance, this factor weighs in favor of granting the Application.

### iii. This Application Does Not Circumvent Foreign Proof-Gathering Restrictions

Nothing in the Application would circumvent any proof-gathering restriction of the Cypriot courts. "This factor entails neither a discoverability requirement nor a quasi-exhaustion requirement . . . that would force litigants to seek information through the foreign or international tribunal before requesting discovery from the district court." *In re Newbrook*, 2020 WL 6451939, at *6 (internal citations and quotation marks omitted); *see also In re ex parte Lee-Shim*, No. 513MC80199LHKPSG, 2013 WL 5568713, at *2 (N.D. Cal. Oct. 9, 2013) ("Section 1782 does not require the documents sought to be discoverable in the foreign courts."). Rather, "a district court may consider whether an applicant seeks in bad faith to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *In re ex parte Lee-Shim*, 2013 WL 5568713, at *2.

Here, NBT seeks discovery relating directly to its claims. Therefore, this factor also weighs in favor of granting the Application.

15

### iv. The Request is Not Unduly Intrusive or Burdensome

NBT seeks records from the NY Banks that are similar to records those banks were already subpoenaed to produce in 2018 in connection with the *PV Group* action. There is no substantial burden associated with reproducing those materials or any other financial records the NY Banks possess that would be responsive to NBT's proposed subpoenas. To the contrary, NY banks frequently produce records relating to financial transactions in response to subpoenas.

## CONCLUSION

For all of the foregoing reasons, this Court should grant NBT's Application and authorize NBT to serve the proposed subpoenas on the NY Banks.

New York, New York
December 29, 2021

HOGAN LOVELLS US LLP

By: /s David R. Michaeli
Dennis H. Tracey, III
David R. Michaeli
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
dennis.tracey@hoganlovells.com
david.michaeli@hoganlovells.com

*Attorneys for Applicant PJSC National Bank Trust*