**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE THE APPLICATION OF PJSC NATIONAL
BANK TRUST

Civ. No.

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782

## DECLARATION OF ANDREY MIKHAILOVICH TSESHINSKIY

I, Andrey Mikhailovich Tseshinskiy, hereby declare as follows:

1.      I am the Head of the Department of Special Projects No. 2 of PJSC National Bank "Trust" ("NBT").  The facts set forth below are based on my personal knowledge or, where outside my personal knowledge, based on information and documents available to NBT.

**A.  The Parties**

2.      NBT is a financial institution headquartered in Russia and owned by the Central Bank of Russia ("CBR") (an independent body with the exclusive right to issue currency and the bank regulating body supervising banking and financial activity in Russia).  NBT has been operating under a financial rehabilitation scheme supervised by the CBR since December 2014, and has been administered by the CBR since 2018.

3.      At issue in this action are financial records relating to transfers to or from two banks controlled by two brothers, Dmitri and Alexei Ananyev – PJSC Promsvyazbank ("PSB") and JSC Avtovazbank ("AVB") – or their affiliates.  PSB was formed by the Ananyev brothers in May 1995.  Within ten years, PSB grew to become one of Russia's twenty largest banks, with more than two dozen regional branches, including one in Cyprus ("PSB Cyprus").  In 2014, PSB became

1

one of the first three banks recognized as a "systemically important bank" by the CBR. The Ananyev brothers maintained indirect majority ownership and control of PSB from at least 2005 until December 2017, when the CBR placed PSB under financial rehabilitation and appointed temporary administrators.

4.     AVB was a state-owned bank established in November 1988. After the collapse of the Soviet Union, AVB became a private bank. In 2015, the CBR placed AVB under financial rehabilitation, and designated PSB as the bank responsible for that financial rehabilitation (a so called "bridge bank"). As a result, PSB became the sole shareholder of AVB and, accordingly, the Ananyev brothers ended up in control of both entities. The CBR intended for AVB to eventually be merged into PSB, however once the CBR discovered PSB's financial problems and seized control over it, CBR terminated PSB's responsibility for rehabilitating AVB. Instead, CBR elected to merge AVB into NBT, at which point NBT became AVB's legal successor in relation to its rights and obligations under all and any agreements.

**B.  The Ananyev Brothers' Fraud**

5.     Between December 27, 2016 and May 16, 2017, the CBR conducted an inspection of PSB's finances. Over the course of the inspection, the CBR determined that PSB held insufficient reserves and needed to increase its reserves by approximately $1.5 billion. In December 2017, the CBR revised the amount of additional capital PSB needed to raise to $1.7 billion after determining that PSB had underestimated certain financial risks.

6.     Following completion of the CBR's inspection, PSB responded to the CBR's regulatory findings by providing financial reports to the CBR. The CBR determined that PSB's internal reports did not reflect the actual financial position of PSB and were substantially unreliable, and ordered PSB to raise its reserve level by the outstanding amount required PSB's

operations. PSB's funds were insufficient to replenish reserves by the outstanding amount indicated by the CBR without the risk of decreasing PSB's own capital below the statutory minimum. Nevertheless, PSB decided to top-up the reserves on the outstanding amount using its own capital. As a result, PSB's own capital decreased below the statutory minimum, which led the CBR placed PSB under temporary administration on 15 December 2017, seizing control of the bank.

7.      On the eve of PSB's nationalization, the Ananyev brothers and affiliated individuals appear to have taken extensive steps to loot remaining assets and destroy evidence, transferring large sums of money to affiliates around the world.

8.      For instance, between May 29, 2017 and December 14, 2017, the Cypriot company Arovana Trading Limited ("Arovana") entered into five loan agreements with PSB which had fixed lending limits of up to RUR 3.08 billion and USD 34.4 million (cumulatively, approximately €67.2 million) (the "Arovana Loan Agreements"). On September 20, 2018, as a result of Arovana's defaults and pursuant to the terms of the Arovana Loan Agreements, AVB accelerated the loans and demanded payment of the outstanding debt. Arovana's debt, which was assigned from PSB to AVB, remains outstanding and is inadequately secured, and I understand that Arovana is in the process of winding up.

9.      Arovana appears to have transferred part of the loan proceeds received from PSB to other companies from the same group of companies (Russian Timber Group of Companies) which were themselves PSB's borrowers. In particular, Arovana transferred RUR 2.67 billion (approx. €39.01 million) out of the funds it had received from PSB to SEL-Trade LLC and TSFK LLC, the Russian companies, which themselves were PSB's borrowers and were part of the Russian Timber Group of Companies connected to Ananyev brothers. The funds were transferred

allegedly as advance payments for timber to be delivered to Arovana, but the timber was not, to my knowledge, ever delivered. The funds appear to have instead been transmitted to other companies in the RTG Group while the suppliers themselves are now in bankruptcy.

10. On January 30, 2014, PSB entered into a loan agreement with the Cypriot company Dimoresa Commercial Ltd ("Dimoresa") with a fixed disbursement limit of $25 million (the "Dimoresa Loan Agreement"). On June 23, 2014, the disbursement limit under the Dimoresa Loan Agreement was raised to $30 million. A guarantee provided by one of the wealthiest guarantors in the transaction was terminated on the eve of PSB's collapse.

11. According to media accounts, the temporary administration appointed to run PSB discovered that credit dossiers for more than RUR 100 billion in loans were "lost." Russian investigators, who were subsequently able to locate those records, determined that they had been removed from PSB at night on December 15, 2017 by someone driving a car with no license plate.

12. Once regulators had access to PSB's records, a fuller and more troubling picture of the bank's problems quickly emerged. Russian regulators determined that PSB actually required approximately $4 billion in additional capital – nearly three times their original estimate – and took steps to bail out PSB through funding provided by the CBR. At that time, AVB was also in financial distress – the very reason the CBR, believing at the time that PSB was financially sound, had originally arranged for PSB to acquire and manage AVB. After discovering PSB's true condition, the CBR changed plans and ultimately arranged for AVB to be merged with NBT. NBT hired KPMG to investigate in detail the events that led to the collapse of PSB and AVB. After doing so, KPMG reported that the Ananyev brothers had perpetrated a massive and complex fraud involving both PSB and AVB.

13.     NBT's forensic investigation into the Ananyev brothers' fraudulent activities is ongoing but has already revealed at least 26 transactions with 11 borrowers that harmed PSB and/or AVB. The Ananyev brothers appear to have used dozens of offshore companies and nominee shareholders to siphon off assets.

**C.     KPMG's Findings**

14.     Details of the in-depth analysis performed by KPMG are set out in KPMG's reports. A true copy of KPMG's 20 October 2020 "Expert Forensic Report" is attached as **Exhibit A**. A true copy of KPMG's 25 May 2021 "Expert Forensic Report" is attached as **Exhibit B**. A true copy of KPMG's 19 July 2021 "Expert Forensic Report" is attached as **Exhibit C.**

15.     Among other things, KPMG determined that: (1) PSB and AVB issued loans on favorable terms and with inadequate security by way of collateral to borrowers with unsatisfactory financial positions; (2) the loan funds were directed to foreign companies (in some cases distributed among the same group as the borrower) with signs of affiliation with the Ananyev brothers and/or in some cases whose beneficiaries were not disclosed in open sources, according to the relevant jurisdictional requirements, and in certain cases were used for commercially dubious transactions; and (3) the loans were not repaid on time by the borrowers, many of which became insolvent, and in most cases with little or no assets and security that was not valuable and/or not enforceable. KPMG concluded that these loans were not made in the best interests of PSB and AVB and show "*signs of fraudulent activities potentially aimed at siphoning assets and funds away from PSB and AVB.*"

**D.     The Ananyev Brothers' Regulatory Fraud**

16.     In addition to making fraudulent loans in order to siphon off depositor funds to their own accounts, the Ananyev brothers also appear to have gone to great lengths to conceal

5

information from Russian banking regulators and creditors. As part of these efforts, PSB maintained two sets of books – "official" documentation that would be presented to the banking regulators for financial and other reporting, and confidential internal documentation, which had the code name at PSB of "CNF Documentation" (CNF stands for "confidential") and which was hidden from regulators and was to be used only by PSB's and AVB's staff.

17. There were also a number of companies (known as "special purpose companies" or "SPCs") that were not formally owned by PSB but were in fact controlled by it. Due to the lack of a formal connection between the SPCs and PSB, these companies appear to have been mainly used to artificially decrease the amount of reserves PSB had to maintain if it participated in a transaction directly. There were two typical ways in which PSB used the SPCs. First, when PSB had to increase the amount of reserves it previously created due to, for example, a borrower's default. In order to avoid creating new provision, PSB would extend a loan to an SPC with the loan amount, in turn, being used to repay the loan of a defaulted borrower. In order to create the fiction that the SPC was a real borrower, employees of AVB and PSB would even draw up a business plan of how the SPC would use the loaned funds. Given that the using of the loan in such circumstances was seemingly for the financial manipulation of capital reserves, it appears that these business plans served no legitimate business purpose. The second way that SPCs appear to have been used involved situations where PSB wanted to gain control over the assets of a defaulted borrower through enforcement, but it was not possible to put the asset on the balance sheet of PSB due to certain difficulties related to banking compliance. PSB would engage an SPC so that the SPC would become the formal owner an asset instead of PSB (e.g. by way of an assignment of the debtor's debt to an SPC, which subsequently took steps to enforce against the debtor's assets on its own behalf, while remaining informally controlled by PSB). As a result, PSB would have de facto

control over the asset but would avoid the negative consequences connected with direct ownership of the asset.

18. The Ananyev brothers' efforts at concealment were highly successful, and allowed them to get away with fraud for years. When creditors and regulators finally closed in, the Ananyev brothers fled the country, absconding with what is estimated to be billions of dollars in misappropriated funds.

### E. NBT's Three Cyprus Actions

19. NBT seeks discovery in this action in support of three claims it has filed in the District Court of Limassol, Cyprus. NBT filed its first claim on November 12, 2020 (Action No. 2598/2020) against the Ananyev brothers and their wives, Lyudmila Ananyeva and Daria Ananyeva (collectively, the "Foreign Defendants"). The claim seeks to recover damages of approximately €270 million for conduct relating to the Ananyev brothers' fraud. In connection with this claim, NBT on *ex parte* basis sought an interim worldwide freezing order against the Foreign Defendants' assets and over assets which are believed to be nominally held on their behalf. The Cypriot court granted this request on November 17, 2020. On November 19, 2021 the judge of the District Court of Limassol, Cyprus set aside the worldwide freezing order on the formal grounds of non-disclosure. The judge accepted arguments of the Foreign Defendants that non-disclosure of the following facts: (1) collection of certain amounts against one of the loan agreement from the sale of mortgaged assets, (2) to sufficiently highlight NBT's efforts to collect from the debtors and (3) to draw the court's attention to the timing of the acquisition of certain assets in Cyprus and in France by Lyudmila Ananyeva are amounted to material non-disclosure.

20. On December 11, 2020, NBT filed a second claim in the District Court of Limassol, Cyprus against the Foreign Defendants (Action No. 2944/2020), seeking to recover additional

damages of between €296 million and €339 million for additional fraudulent transfers and activities uncovered by KPMG's ongoing analysis. On October 20, 2021 NBT on an *inter partes* basis sought an interim worldwide freezing order against the Foreign Defendants' assets and over assets which are believed to be nominally held on their behalf. The application is currently pending in Cyprus.

21.     On December 11, 2020, NBT filed a third claim in the District Court of Limassol, Cyprus against the Foreign Defendants, seeking to recover additional damages of between €15 million and €17 million for additional fraudulent transfers and activities. All three actions are currently pending in Cyprus.

### F.     The Relevance of the NY Banks

22.     Although the Ananyev brothers' fraud was complex, at its heart it involved transferring money from PSB, AVB, or affiliates to entities or individuals indirectly or directly affiliated with Ananyev brothers, who then passed the funds on to other affiliates of Ananyev brothers without ever repaying the funds to the banks that provided the original loans. Several of these transactions are believed to have been conducted in US dollars through the NY Banks. PSB is believed to have used the NY Banks, each of which was previously listed on PSB's website as a PSB correspondent bank, to process US dollar transactions.

23.     NBT seeks discovery relating to any such transactions, including but not limited to transactions involving PSB, AVB, and any of the following entities and/or individuals affiliated with the Ananyev brothers: Antracite Investment Limited; Urgula Platinum Limited, Menrela Limited, Promsvyaz Capital B.V.; Peters International (Cayman) Limited; Peters International Investment Limited N.V.; Postscriptum Capital Limited; Fintailor Investments Limited, companies involved in Delvenisto Scheme (Delvenisto Investments Limited, Marendo

Investments Limited, Krasnobrodsky Yuzhny LLC, Anevlessa Investments Ltd, Wolater Investments Limited, Queeld Ventures Limited, Croston Consultant Limited, Kipford Ventures Ltd, Cydrine Investment Ltd, Garrison Corporate Ltd); companies involved in Klirinaso Scheme (Klirinasto Investments Limited, Menilo Trading Limited, Razrez Nagorny LLC, Unique Marketing and Investments Ltd, Zafirex Trading Limited); companies involved in Fivolsenso Scheme (Fivolsenso Services Ltd, Fikotelisa Investments Ltd, Sibirskie Resursy LLC); companies involved in Finans Invest Scheme (Finans Invest LLC, Jakardis Holdings Limited, Zorilla Investments Limited, Evryhos Management Limited, Tokarevo LLC, Moselectrotechnology LLC, Standard System Building LLC, AS-Stroykontakt LLC, PSC Stroyfaza LLC, Elmdale Investments Limited, Brightstar Overseas Inc), companies involved in Dimoresa Scheme (Dimoresa Commercial Ltd, Agro Centre LLC, Stroyzemproekt LLC, Solntsevo JSC, Torino LLC, PSN Group, Zafirex Trading Limited); companies involved in Atecia Scheme (Atecia Holdings Limited, Promsvyaz Real Estate Private Equity Fund L.P.); companies involved in Arovana Scheme (Arovana Trading Limited, RTG Group); Dmitri Ananyev; Alexei Ananyev; Elena Nikolaevna Tsareva; Gennady Anatolievich Kochkalda; Andrey Vladislavovich Tokarev; Zhanneta Levienvna Isakova; Oleg Olegovich Sultanbekov; Mikhail Vicheslavovich Malykhin; Elena Borisovna Titova; Elena Mikhailovna Kazakova; and Alexandr Ivanovich Romannikov.

24.     Briefly put, NBT believes that such transactions may be connected to or form part of one or more fraudulent schemes orchestrated by the Ananyev brothers, as I describe more fully below.

## G.  The Delvenisto Scheme

25.     In January 2017, when the Ananyev brothers held executive positions at PSB, PSB entered into a loan agreement with the Cypriot company Delvenisto Investments Limited

("Delvenisto") and issued a loan with a fixed disbursement limit of $85.08 million to it (the "Delvenisto Loan Agreement"). These funds were distributed to Delvenisto's US dollar bank account with PSB Cyprus. The Delvenisto Loan Agreement was subsequently assigned to AVB and then to NBT (in the result of merger of AVB into NBT). Delvenisto was associated with the Ananyev brothers through its Cypriot shareholders and directors, who also acted as shareholders and/or executives in other companies beneficially owned by, or connected to, Ananyev brothers.

26. Delvenisto transferred the $85.08 million in loan proceeds to Marendo Investments Limited, a Cypriot company associated with the Ananyev brothers. This was purportedly for the acquisition of shares in Krasnobrodsky Yuzhny LLC ("Krasnobrodsky"). However, the circumstances of the acquisition and findings of the Russian tax authorities suggest that the acquisition was artificial and that the Ananyev brothers used Delvenisto as a vehicle to siphon funds away from PSB.

27. Having acquired the shares in Krasnobrodsky, on July 19, 2017 Delvenisto transferred those shares to a further subsidiary, Redveid LLC ("Redveid") as a capital contribution. Between October 23, 2017 and November 20, 2017 Delvenisto sold a total of 99.9% of the shares in the authorised share capital of Redveid for $153.6 million to Wolater Investments Limited (Cyprus) ("Wolater") and Krasnobrodsky. Delvenisto received a payment of $ 45 million from Wolater on October 27, 2017 and a payment of $100 million from Krasnobrodsky on November 22, 2017. The $45 million received from Wolater had been paid to Wolater on the same date (October 27, 2017) by Anevlessa Investments Ltd (Cyprus) ("Anevlessa") which had, in turn, received those funds from Fintailor Investments Ltd (Cyprus). Delvenisto distributed the funds received including by way of USD-denominated payments of $40.26 million to Queeld Ventures Limited (Cyprus) in the period December 1 to December 13, 2017 (which funds were then further

transferred to Croston Consultant Limited and then Kipford Ventures Ltd); and a payment of $45 million to Cydrine Investment Ltd on October 27, 2017 (which funds were then further transferred to Garrison Corporate Ltd and then to Fintailor Investments Ltd on the same date).

28.     In December 2017 and January 2018, shortly after the CBR took over PSB's management (by way of the temporary administration referred to above), Delvenisto failed to repay a portion of the principal debt and interest due.  Following these failure and pursuant to the terms of the Delvenisto Loan Agreement, in August 2018, AVB (which had, by this time, acquired the loan) accelerated the loan and required a full repayment of the outstanding debt.  In 2020, the Russian court granted NBT's claims in this regard in full.

29.     It is clear that Delvenisto's financial position was unsatisfactory when the loan was issued. The company reported no revenue and negative net assets for 2016.  The CBR, which inspected PSB in 2017, concluded that PSB inadequately assessed Delvenisto's financial position as moderate while in fact it was "bad".  The Russian Tax Authority also noted that Delvenisto was a conduit company.

30.     Under the Delvenisto Loan Agreement, Delvenisto should have provided various pledges and guarantees to secure its lending obligations.  No such security was provided.

31.     In light of the above (and the detailed assessment made by KPMG in support of these statements) it seems clear that the loan under the Delvenisto Loan Agreement was issued by PSB in bad faith for the benefit of the Ananyev brothers.

**H.  The Klirinasto Scheme**

32.     In March 2017, when the Ananyev brothers held executive positions at PSB, PSB entered into a loan agreement with the Cypriot company Klirinasto Investments Ltd ("Klirinasto") with a fixed lending limit of $100 million (the "Klirinasto Loan Agreement").  Between March

and September 2017, Klirinasto received $96.75 million from PSB in four tranches pursuant to that agreement to the bank account with PSB Cyprus. The Klirinasto Loan Agreement was subsequently assigned to AVB and then to NBT (in the result of merger of AVB into NBT). Klirinasto failed to repay the loan on its maturity date of 15 March 2019.

33.     Klirinasto was connected to the Ananyev brothers through Cypriot individuals Mr. Chrysostomos Sofocleous and Mr. Christakis Sylitziotis, who acted as registered shareholders and/or Directors in companies beneficially owned by, or associated with, the Ananyev brothers.

34.     Klirinasto transferred loan proceeds of $ 96.75 million to Anevlessa as payment for 100% of the shares in Menilo Trading Limited ("Menilo") on or around March 21, 2017. At that time the only asset of Menilo was its ownership of 100% of the shares in Razrez Nagorny LLC, the only asset of which, in turn, was a license to explore for and mine coal in the Chuazassky area; that license was subsequently re-registered away from Razrez Nagorny LLC and Menilo's shareholding in that company was alienated. The seller of the Menilo shares acquired them only a few hours before selling them to Klirinasto and appears to have significantly overstated the sale price. The key asset underlying the shares acquired by Klirinasto was a coal mining license, but it was not used for any mining activities and was subsequently disposed of. These circumstances indicate that the transactions lacked a genuine business purpose and were entered into for the purpose of siphoning away PSB funds for the benefit of the Ananyev brothers.

35.     It is clear from a review of Klirinasto financial statements that Klirinasto Loan Agreement was improper and that Klirinasto lacked any reasonable need for the funds or reasonable way to repay them. Klirinasto did not carry out any activities prior to 2017 and reported negative net assets, a financial loss and no revenues or operational income for 2016 and 2017. Further, KPMG has determined that Klirinasto provided PSB with grossly inadequate security for

the nearly $100 million in loans it received, consisting solely of a guarantee issued by Klirinasto's subsidiary, which had negative net assets and its income covered only 0.2% of the lending limit when the guarantee was provided. No bank acting for legitimate commercial reasons would have made these loans to Klirinasto. Nor were the loans made using PSB's normal procedures.

36.     NBT has identified a "CNF" draft credit committee decision (part of the CNF Documentation referred to above) indicating that Ananyev brothers personally controlled the allocation of funds to the Nagorny Razrez group of companies, which included Klirinasto, and that PSB issued loans to this group without the documents necessary for issuing the loan and in circumvention of its internal procedures.

37.     In light of the above (and the detailed assessment in support of these statements in the KPMG Report), NBT believes that the Klirinasto Loan Agreement was made in bad faith and for the purposes of transferring nearly $100 million in depositor funds from PSB to entities owned or controlled by the Ananyev brothers.

## I.  The Fivolsenso Scheme

38.     In April 2017, when the Ananyev brothers held executive positions at PSB, PSB entered into a loan agreement with the Cypriot company Fivolsenso Services Ltd ("Fivolsenso"), whereby Fivolsenso received a loan of $ 70 million (the "Fivolsenso Loan Agreement") to the bank account with PSB Cyprus. That loan agreement was subsequently assigned to AVB and then to NBT (in the result of merger of AVB into NBT) .

39.     Fivolsenso was connected to the Ananyev brothers through its shareholder Ms. Anna Korelidou. She was a shareholder of a Cypriot company beneficially owned by Dmitri and used by him to hold shares in Vozrozhdeniye Bank. She was also publicly disclosed by PSB, PSC and Vozrozhdeniye Bank as an affiliated person.

40. Fivolsenso transferred loan proceeds of $70 million to Fikotelisa Investments Ltd ("Fikotelisa"), as a payment for the acquisition of 100% of the shares in Sibirskie Resursy LLC on July 20, 2017. Fikotelisa had acquired those shares around two months earlier, and at the date of the sale to Fivolsenso the total assets of Sibirskie Resursy LLC amounted to RUB 190.42 million ($3.14 million). Fivolsenso sold Sibirskie Resursy LLC to Unique Marketing and Investments Ltd on December 29, 2018.

41. Fivolsenso failed to pay interest due since December 2017 and further failed to repay a portion of the loan that became due in September 2020. Following these failures, in October 2020, NBT demanded early repayment of the full amount of the loan, but has not received any payment in response to this demand

42. As with Klirinasto, Fivolsenso's financial statements demonstrate that Fivolsenso was not credit worthy and would not have received $70 million in loans from any bank engaging in legitimate lending activity. The company had negative net assets, reported financial losses and did not receive any revenue for 2016. Further, KPMG has confirmed that the security that Fivolsenso provided under the Fivolsenso Loan Agreement was inadequate and insufficient. It consists only of a guarantee issued by Fivolsenso's subsidiary, which reported a financial loss and its revenues would not have covered even 0.1% of the loan amount when the guarantee was issued.

43. No bank in Russia acting reasonably and in good faith would issue a significantly under-secured loan for tens of millions of dollars to a company with such poor financial standing.

44. Fivolsenso transferred the loan funds to another Cypriot company associated with the Ananyev brothers purportedly for the acquisition of shares in a Russian company. The seller of the shares acquired them only two months before selling them to Fivolsenso and appears to have overstated the sale price by at least 12 times. Fivolsenso sold the shares acquired in less than two

14

years after their acquisition. These circumstances (when considered together with the above) indicate that the transactions lacked a genuine business purpose and served as a cover-up for the siphoning away of funds from PSB for the benefit of the Ananyev brothers.

45. In light of the above (and the detailed assessment made by KPMG in support of these statements), it seems clear that the Fivolsenso Loan Agreement was issued by PSB in bad faith for the benefit of Ananyev brothers.

**J. The Finans Invest Scheme**

46. On February 26, 2014, when the Ananyev brothers held senior positions at PSB, PSB entered into three loan agreements with the Russian company Finans Invest LLC ("Finans Invest") with fixed lending limits for a total of $110.4 million (the "Finans Invest Loan Agreements"). Between February and March 2014, Finans Invest maxed out this credit facility to the bank account with PSB. The loan agreement was subsequently assigned to AVB and then to NBT (in the result of merger of AVB into NBT).

47. Finans Invest was connected to the Ananyev brothers through its indirect shareholder Mr. Panagiotis Kinanis, who at various points was involved with other companies associated with Dmitri Ananyev.

48. Finans Invest transferred $103.4 million (94% of the loan proceeds) of the funds it received from PSB to three companies, Jakardis Holdings Limited (Cyprus), Zorilla Investments Limited (Cyprus) and Evryhos Management Limited (Cyprus), seemingly to finance the repayment by those companies of loans made to them by PSB Cyprus which, in turn, had financed the purchase by them of 94.34% of the shares in Finans Invest. At least two of those companies were affiliated with the Ananyev brothers. It appears Finans Invest caused the loan proceeds to be converted to RUB before making these transfers via intermediaries Tokarevo LLC,

15

Moselectrotechnology LLC, Standard System Building LLC, AS-Stroykontakt LLC, and PSC Stroyfaza LLC. The proceeds were subsequently transferred to Elmdale Investments Limited (Belize) and Brightstar Overseas Inc (Belize) to finance the acquisition of further companies.

49.     Finans Invest stopped servicing its debt on December 29, 2017, shortly after the CBR (through the temporary administration) took over PSB's management. In August 2018, as a result of Finans Invest's default and pursuant to the terms of the Finans Invest Loan Agreements, AVB accelerated the loans and demanded that the outstanding debt was paid.

50.     It is clear that the financial position of Finans Invest when it entered into the Finans Invest Loan Agreements and thereafter was unsatisfactory. On August 22, 2018, Finans Invest was declared bankrupt. Its assets are not sufficient to satisfy all of its creditors' claims.

51.     Further, Finans Invest did not provide adequate security under the Finans Invest Loan Agreements. The pledges provided appear to have been accepted by PSB without checking their market value and/or they based on expired documents. They were relatively illiquid assets, while the guarantees provided were issued by related parties, some of which had an unsatisfactory financial position and/or were subsequently canceled.

52.     A "CNF" credit committee decision (part of the CNF Documentation) suggests that PSB (under the control of the Ananyev brothers) fully understood the economic and legal risks associated with the security provided, and tried to disregard or conceal them and circumvented its internal procedures with respect to Finans Invest.

53.     Notwithstanding Finans Invest's poor financial condition and lack of effective security, PSB and, after the assignment to AVB, AVB provided Finans Invest with favourable repayment terms, pursuant to which Finans Invest received an extension of the repayment terms

by approximately two years and was partially released from payment of interest until the final repayment date. Some of these favorable terms were personally approved by Dmitri Ananyev.

54. In light of the above (and the detailed assessment made by KPMG in support of these statements), NBT believes that the Finans Invest Loan Agreements were made in bad faith, to the detriment of PSB and for the benefit of Ananyev brothers.

**K. The Dimoresa Scheme**

55. On January 30, 2014, PSB entered into a loan agreement with the Cypriot company Dimoresa Commercial Ltd ("Dimoresa") with a fixed disbursement limit of $25 million (the "Dimoresa Loan Agreement"). On June 23, 2014, the disbursement limit under the Dimoresa Loan Agreement was raised to $30 million. Dimoresa utilized the disbursement limit in full. These funds were distributed to Dimoresa's US dollar bank account with PSB Cyprus.

56. On January 30, 2018, shortly after the CBR (through the temporary administration) took over PSB's management, Dimoresa defaulted on the Dimoresa Loan Agreement. The loan agreement was subsequently assigned to AVB and then to NBT (in the result of merger of AVB into NBT).

57. NBT obtained a Russian judgment against Dimoresa to recover the outstanding debt under the Dimoresa Loan Agreement. NBT's claims arising out of the Dimoresa Loan Agreement were registered in the insolvency registers of all three guarantors, Agro Centre LLC, Stroyzemproekt LLC and Solntsevo JSC. There was an auction within bankruptcy proceedings of one of Dimoresa's pledgors – Torino LLC – on the sale of real estate pledged by that company in favor of Dimoresa. The auction was declared frustrated because of the absence of any bids for the real estate put on sale. In view of this development, NBT issued the decision to foreclose on the pledged assets of Torino LLC by way of transfer of the title to them to the NBT. The assets

transferred to NBT were used to partially settle the debt under the Dimoresa Loan Agreement in the amount of RUR 467.6 million (approx. $6.4 million).

58.     The corporate registers and correspondence available to NBT suggest that Dimoresa was connected with and/or ultimately controlled by the Ananyev brothers through the PSN Group.

59.     The entire proceeds of the Dimoresa Loan Agreement (that is, $30 million) were used by Dimoresa to purchase shares in a company affiliated with Dmitri Ananyev. The purchase price Dimoresa paid for the shares ($30 million) appears to have been inflated by approximately 100,000 times its actual value, as compared to the total assets of the purchased company before the purchase ($275). Accordingly, around January 30, 2014, Dimoresa transferred $ 30 million to Zafirex Trading Limited (Cyprus). It appears that Zafirex Trading Limited used those funds to make loans, although the recipients of those loans are currently unknown.

60.     In light of the above (and the detailed assessment made by KPMG in support of these statements), NBT believes that the Dimoresa Loan Agreement was issued by PSB in bad faith and for the benefit of the Ananyev brothers.

**L.  The Atecia Scheme**

61.     On June 4, 2013 PSB entered into among others two loan agreements with the Cypriot company Atecia Holdings Limited ("Atecia") that had fixed lending limits of up to $50 million ("Atecia Loan Agreements"). These funds were distributed to Atecia's US dollar bank account with PSB Cyprus.

62.     Atecia has not fulfilled its obligations to repay the loans and interest since January 11, 2018, i.e. shortly after the CBR (through the temporary administration) took over the

management of PSB.  The loan agreements were subsequently assigned to AVB and then to NBT (in the result of merger of AVB into NBT).

63.     At all material times, Atecia belonged to the PSN Group of companies, which was controlled by Dmitri Ananyev.  When the loans were issued in 2013, Atecia was indirectly owned by Promsvyaz Real Estate Private Equity Fund L.P. (a Cayman Islands company).  Promsvyaz Real Estate Private Equity Fund L.P. was at that time a holding company of the PSN Group.  In 2013, the group was restructured and Promsvyaz Real Estate Private Equity Fund L.P. was replaced with a Cypriot company.

64.     During the period that the Atecia Loan Agreements were entered into Atecia was in a poor financial position.  During this period, Atecia's Financial Statements reported losses or no meaningful profits (2013-2016) and insufficient revenues (2013, 2015-2016) which were almost 10 times lower that the loan disbursement limits under the Atecia Loan Agreements.

65.     Despite the poor financial position of Atecia and the lack of effective security, PSB granted favorable interest repayment terms for the Atecia Loan Agreements (as compared to the standard market practice that existed when the respective loan agreements were entered into), pursuant to which Atecia did not have to repay a portion of the interest accrued under the Atecia Loan Agreements (between 54% and 100% of the total amount) until the final repayment dates for each loan.

66.     In 2017, the CBR conducted an inspection to assess the financial standing of PSB and some of its borrowers.  Atecia was one of the borrowers analysed by the CBR.

67.     Following its inspection, the CBR concluded that PSB incorrectly assessed the financial position of Atecia as "good".  According to the CBR, it should have been assessed as "bad".  The CBR also noted that "the analysis of financial and operational activities [of Atecia]

evidences that there are threatening negative developments (tendency), which might potentially result in the borrower's insolvency (bankruptcy) or stable inability to repay its debts".

68.     Atecia did not provide sufficient security to PSB for its lending obligations.  Atecia Loan Agreements, were purportedly secured.  However, the relevant security that was put in place was partially or wholly lifted under the direction of Dmitri Ananyev and/or Alexei Ananyev:

69.     First, a set of pledges of land plots was partially terminated in 2017.

70.     Second, a guarantee issued by a BVI company called Lorania Ventures Limited was terminated (with the agreement of PSB) two months after it was issued in 2013.

71.     In each case, the guarantor and pledgors referred to above belonged to the PSN Group controlled by Dmitri Ananyev, e.g., the pledgors were indirectly owned by Atecia and their CEO, Mr, Sergey Glebov, who served as a Vice President of the PSN Group between 2012 and 2013, and at all material times, Atecia belonged to the PSN Group.

72.     NBT has obtained CNF Documentation relating to a loan facility issued to a group of companies called Konyushennaya Ploschad.  This group consisted of two companies, Omitesena Investments Ltd and Taala LLC.  Atecia was listed as the guarantor of the loan facility. In the obtained CNF credit committee decision,  it was stated that the loaned funds were to be transferred for repayment of the debt of the PSN Group.  In contrast, the purpose of the loan stated in the official credit committee decision was the acquisition of shares in a company called Bonnik Holdings Limited.

73.     NBT attempts to recover damages from Atecia and from six pledgors.  NBT does not expect to recover any substantial amount from either Atecia or the pledgors.

74.     In light of the above (and the detailed assessment made by KPMG in support of these statements), NBT believes that the Atecia Loan Agreements were issued by PSB in bad faith and for the benefit of the Ananyev brothers.

**M. The Arovana Scheme**

75.     In the period of December – November 2017 PSB entered into among others two loan agreements with the Cypriot company Arovana Trading Limited ("Arovana") that had fixed lending limits of up to $34.4 million ("Arovana Loan Agreements"). These funds were distributed to Arovana's bank account with PSB. The timing of the loans is telling. The last loan, for $17 million, was issued on December 14, 2017, i.e. just one day before the introduction of the temporary administration at PSB.

76.     Arovana stopped servicing its debt shortly after the CBR took over PSB's management and has not fulfilled its obligations under the loans since April 4, 2018. The loan agreements were subsequently assigned to AVB and then to NBT (in the result of merger of AVB into NBT). Arovana has been in liquidation since November 2019 pursuant to an order of the competent Cypriot Court, and is in the process of being wound up by the court.

77.     Arovana was a company associated with Ananyev brothers. Arovana belonged to a group of companies engaged in the timber business (known as the RTG Group), which was connected to Ananyev brothers through its shareholders and people who represented it. From at least September 2015 to November 2016, companies from the RTG Group were PSB's subsidiaries. As provided in the Lists of Affiliates of PSB and the PSN Group, Arovana was registered at Griva Digeni 115, Trident Centre, 3101, Limassol, Cyprus. This address was also indicated in public disclosures of PSB and the PSN Group as the address for Atecia and over a

dozen other companies that belonged to the PSB group of companies and/or PSN group of companies controlled by Dmitri Ananyev and/or Alexei Ananyev.

78.     As of September 30, 2017, Arovana's net assets were approximately 92 times lower than the loan amounts, which meant that Arovana depended heavily on the loan funds and lacked its own assets to perform ongoing operations.

79.     Arovana did not provide even remotely adequate security for its lending obligations. Under the Arovana Loan Agreements, the security provided should have included a mortgage of property, a pledge of fixed assets, a pledge of 100% of the shares in companies in the RTG group, and guarantees from companies in the RTG group. NBT has not been able to identify any evidence of the execution of the said security, except for the execution of a number of guarantees issued by Russian companies associated with Ananyev brothers, which had unsatisfactory financial positions and have been ultimately declared bankrupt. Further, the December 14, 2017 loan, which was issued on the eve of the introduction of the temporary administration at PSB, appears not to have been secured at all. Notwithstanding Arovana's poor financial condition and lack of any effective security, PSB released Arovana from payment of interest in part until the final repayment date of the loans.

80.     The subsequent use of the loan funds by Arovana further indicates that the real purpose of the loans was to siphon off funds from PSB for the benefit of companies affiliated with Ananyev brothers.

81.     In light of the above (and the detailed assessment made by KPMG in support of these statements), NBT believes that the Arovana Loan Agreements were issued by PSB in bad faith and for the benefit of the Ananyev brothers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: December 23, 2021

_____
Andrey Mikhailovich Tseshinskiy
Head of the department of special projects No. 2 of
PJSC National Bank "Trust"